[Cite as *Morgan v. Community Health Partners*, 2013-Ohio-2259.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | | |
|---|---|---|
| SCOTT H. MORGAN, et al. | | C.A. No.    12CA010242 |
| Appellants | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| COMMUNITY HEALTH PARTNERS REGIONAL MEDICAL CENTER, et al. | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO CASE No.    07CV151569 |
| Appellees | | |

DECISION AND JOURNAL ENTRY

Dated: June 3, 2013

MOORE, Presiding Judge.

{¶1} Plaintiffs, Scott H. Morgan and Belinda Garza-Morgan (collectively "the Morgans"), appeal from the ruling of the Lorain County Court of Common Pleas, which granted summary judgment to Community Health Partners Regional Medical Center ("Community Health") and James Snowden (collectively "Appellees") and dismissed the Morgans' complaint. For the reasons set forth below, we affirm.

I.

{¶2} In the early morning hours of July 31, 2006, Mr. Morgan drove his wife, Ms. Garza-Morgan, to the emergency department of a hospital operated by Community Health, for treatment of a laceration to her scalp. Mr. Morgan left the hospital while Ms. Garza-Morgan was receiving treatment. Thereafter, a Community Health employee, James Snowden, alerted the Lorain Police Department that hospital staff suspected that Ms. Garza-Morgan had been the victim of domestic violence. Officers arrived at the hospital to investigate and conducted

interviews with hospital staff and Ms. Garza-Morgan. Later that morning, when Mr. Morgan returned to pick up Ms. Garza-Morgan, an officer arrived at the hospital and arrested him on a charge of domestic violence. The charge was ultimately dismissed upon the motion of the prosecutor and at the request of Ms. Garza-Morgan.

{¶3} On June 29, 2007, the Morgans filed a complaint against Appellees alleging negligence, actual malice, and invasion of privacy resulting from Appellees' disclosure of Ms. Garza-Morgan's injuries and Appellees' suspicions of domestic violence to law enforcement.[1] Appellees filed a motion for summary judgment, arguing in part that they were required to make these disclosures to law enforcement, and that they were immune from liability for doing so pursuant to R.C. 2921.22(B)/(H). The trial court denied the motion. Thereafter, Appellees filed a second summary judgment motion, again arguing in part that they were statutorily immune from liability. The trial court granted the second motion for summary judgment on the basis of R.C. 2921.22 and dismissed the Morgans' complaint. The Morgans timely appealed from the judgment of the trial court, and they now present one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED BY GRANTING[ ]SUMMARY JUDGMENT IN FAVOR OF APPELLEES UNDER R.C. 2921.22.

{¶4} In their sole assignment of error, the Morgans argue that the trial court erred in granting Appellees' motion for summary judgment.

---

[1] The Morgans also named three John Does in their complaint, but the record does not indicate that service was perfected on these unidentified parties.

**{¶5}** This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civ.R. 56(C), summary judgment is proper if:

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**{¶6}** The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-93 (1996). The moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). *Dresher* at 292-93. If the moving party satisfies its initial burden, the non-moving party bears the burden of offering specific facts to show a genuine issue for trial. *Id.* The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to, or provide, some evidentiary material that demonstrates a genuine dispute over a material fact. *In re Fike Trust*, 9th Dist. No. 06CA0018, 2006-Ohio-6332, ¶ 10.

**{¶7}** Here, in the first two counts of the complaint, Mr. Morgan alleged that Mr. Snowden had defamed him, both negligently and with actual malice, by stating to the Lorain Police Department that Mr. Morgan was responsible for Ms. Garza-Morgan's injuries. Mr. Morgan claimed that Community Health was responsible on the defamation claims based upon the doctrine of respondeat superior. In the third count of the complaint, Ms. Garza-Morgan alleged that Appellees had violated her right to privacy by disclosing her confidential medical information to the police department.

Defamation and Privilege

**{¶8}** In regard to Mr. Morgan's defamation claims, "[i]n Ohio, defamation occurs when a publication contains a false statement 'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'" *Sturdevant v. Likley*, 9th Dist. No. 12CA0024-M, 2013-Ohio-987, ¶ 7, quoting *Jackson v. City of Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, ¶ 9, quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7 (1995). However, "[p]rivilege in the law of defamation recognizes certain communications as not being within the rules imposing liability for defamation. A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, would be defamatory, and actionable." *Costanzo v. Gaul*, 62 Ohio St.2d 106, 108 (1980).

**{¶9}** Privileged communications may be either qualifiedly or absolutely privileged. *Id.* In *M.J. DiCorpo, Inc. v. Sweeney*, 69 Ohio St.3d 497, 505 (1994), the Ohio Supreme Court explained the rationale for providing a privilege to certain communications and the difference between the two forms of privilege:

> Upon certain privileged occasions where there is a great enough public interest in encouraging uninhibited freedom of expression to require the sacrifice of the right of the individual to protect his reputation by civil suit, the law recognizes that false, defamatory matter may be published without civil liability. * * *

> Such privileged occasions have by long judicial history been divided into two classes–occasions absolutely privileged and those upon which the privilege is only a qualified one. The distinction between these two classes is that the absolute privilege protects the publisher of a false, defamatory statement even though it is made with actual malice, in bad faith and with knowledge of its falsity; whereas the presence of such circumstances will defeat the assertion of a qualified privilege. * * *

*Id.* at 505, quoting *Bigelow v. Brumley*, 138 Ohio St. 574, 579-580 (1941).

{¶10} A statement is qualifiedly privileged if it is made in good faith, on a subject in which the speaker has an interest or duty, limited in scope to this purpose, and made on a proper occasion, in a proper manner, and to a proper party. *Hahn v. Kotten*, 43 Ohio St.2d 237, 244 (1975). In contrast, a speaker cannot be held liable for defamation when his statement is absolutely privileged, regardless of his motives for making the statement. *Sweeney* at 505. Absolute privilege is applied narrowly and "has been generally limited to legislative and judicial proceedings, and other acts of state[.]" *Costanzo* at 109; *Sweeney* at 505, quoting *Bigelow* at 579-580.

Invasion of Privacy

{¶11} In regard to Ms. Garza-Morgan's claim for invasion of privacy, Ohio law recognizes several types of invasion of privacy causes of action. *See Housh v. Peth*, 165 Ohio St. 35 (1956), paragraph two of the syllabus. The theory implicated here involves the public disclosure of private facts, a required element of which is "publicity." *Hamrick v. Wellman Products Group*, 9th Dist. No. 03CA0146-M, 2004-Ohio-5170, ¶ 36. "'Publicity' requires a communication 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge[.]'" *Id.*, quoting *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d at 166 (10th Dist.1985).

Wrongful Disclosure of Medical Information

{¶12} Ms. Garza-Morgan's claim for invasion of privacy may also constitute a claim for unauthorized disclosure of medical information against Community Health. This tort is independent from that of invasion of privacy, and it protects against "the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Biddle v. Warren Gen. Hosp.*, 86

Ohio St.3d 395 (1999), paragraph one of the syllabus. However, no liability on the part of the physician or hospital on such a claim can result from the physician's or hospital's disclosure that is made pursuant to law. *Id.* at paragraph two of the syllabus.

R.C. 2921.22

{¶13} Appellees argued, and the trial court agreed, that they were immune from liability on the above claims pursuant to R.C. 2921.22(B)/(H). R.C. 2921.22(B) provides that "no physician, limited practitioner, nurse, or other person giving aid to a sick or injured person shall negligently fail to report to law enforcement authorities * * * any serious physical harm to persons that the physician, limited practitioner, nurse, or person knows or has reasonable cause to believe resulted from an offense of violence." An "offense of violence" includes an act of domestic violence in violation of R.C. 2919.25. R.C. 2901.01(A)(9)(a).

{¶14} R.C. 2921.22(H) provides that "[n]o disclosure of information pursuant to this section gives rise to any liability or recrimination for a breach of privilege or confidence." "The purpose of R.C. 2921.22 is to compel the release of information necessary to aid in the solving of crimes without fear of recourse against the divulging party." *Whipple v. Render*, 9th Dist. No. 2480, 1989 WL 106582, *2 (Sept. 13, 1989): *see also Kelly v. Accountancy Bd. of Ohio*, 88 Ohio App.3d 453, 459 (10th Dist.1993) (R.C. 2921.22 "unambiguously reveals an intent on the part of the legislature to encourage the reporting of felonies and to prohibit recrimination against individuals who make such required disclosures."). Disclosure of information pursuant to this section encompasses a range of disclosure acts reasonably related to reporting the criminal activity at issue. *See Kelly* at 459-460.

Appellees' Motion for Summary Judgment

**{¶15}** In support of their motion for summary judgment, Appellees provided the deposition testimony of Mr. Snowden, Mr. Morgan, Amy Ramey, PA, Debra Rathge, RN, Deborah Vinesky, RN, and Marc Baumgard, M.D. The Appellees further provided an affidavit of the arresting officer, Sargent Kenneth Zapolski.

**{¶16}** Mr. Snowden testified that he has worked at the hospital for three years as an "access family liaison." His job duties include taking patient information at the emergency room window and providing that information to medical staff. Mr. Snowden observed the Morgans on the morning at issue. When Ms. Garza-Morgan arrived, she entered the emergency room alone, covered in blood. A nurse escorted her to the examination rooms. Afterward, Mr. Morgan entered the emergency room lobby and told Mr. Snowden that his wife had come in and that he would wait in the lobby until she was ready to leave. Mr. Snowden testified that Mr. Morgan's behavior seemed odd to him because Mr. Morgan was "very casual" and it "almost seemed like he didn't care and he just sat down." Mr. Snowden asked Mr. Morgan what had happened, and Mr. Morgan told him that he rolled over in bed and saw that his wife was bleeding. He then went to the bathroom, where he found a large amount of blood. After cleaning the bathroom, he drove his wife to the emergency room.

**{¶17}** Approximately one-half hour after the Morgans arrived at the hospital, Mr. Morgan advised Mr. Snowden that he was going home to prepare for work and asked him to call him when his wife was ready to leave. Mr. Snowden believed it to be suspicious and unusual that a spouse would leave the hospital while the other was being treated, without asking to see her or inquiring as to her status. Mr. Snowden relayed his suspicions to Dr. Baumgard, the

emergency room's physician on duty. Dr. Baumgard asked Mr. Snowden to contact the police department to investigate.

{¶18} During his deposition, Mr. Morgan testified that Mr. Snowden did not ask him how Ms. Garza-Morgan sustained her injuries, and Mr. Morgan did not recall speaking to Mr. Snowden regarding where or how he encountered his wife that morning prior to arriving at the hospital. However, Mr. Morgan confirmed that most of Mr. Snowden's account of how Mr. Morgan discovered his wife was injured was accurate, except that Mr. Morgan did not see or clean blood in the bathroom before coming to the hospital. Mr. Morgan testified that Mr. Snowden had appeared "amus[ed]" when Mr. Morgan was waiting in the lobby for his wife.

{¶19} Ms. Ramey testified that she is a physician's assistant, and she was working at the Community Health facility when Ms. Garza-Morgan arrived. Although she could not independently recollect treating Ms. Garza-Morgan, Ms. Ramey reviewed the patient notes in the hospital's file. The notes indicated that Ms. Garza-Morgan claimed that she awoke that morning to discover that her head was bleeding, and, although she could not explain what had happened to her, she believed that she had fallen. The laceration on Ms. Garza-Morgan's head was six centimeters in length and one-half of a centimeter deep. The size of the laceration required Ms. Ramey to use two layers of closures and sutures to treat it. Staff also identified abrasions to her right knee and shoulder. Ms. Ramey testified that given the nature and location of the injuries, and Ms. Garza-Morgan's inability to explain how she was injured, she believed that there was a reasonable basis on which to call the police to investigate. Ms. Ramey further noted that it is common practice to request a non-medical staff member to contact law enforcement in such situations so that the medical staff can concentrate on treating the patient.

{¶20} Ms. Rathge and Ms. Vinesky testified that they are registered nurses who treated Ms. Garza-Morgan. Ms. Rathge concurred that the laceration was very large, and that Ms. Garza-Morgan had abrasions on various locations on her body. Ms. Rathge opined that, "if she did fall, she would have had to have fallen many times to get those type of injuries in the various spots." Ms. Vinesky testified that she arrived for work at approximately 7:00 a.m. on the date at issue. Ms. Garza-Morgan was very anxious to leave when Ms. Vinesky arrived. Ms. Vinesky noted on the patient chart that Ms. Garza-Morgan denied that any harm had been done to her by her husband.

{¶21} Dr. Baumgard testified that when he examined Ms. Garza-Morgan, her mannerisms were consistent with an individual who was under the influence or very confused. He noted that the nurses had documented bruises on her shoulder that appeared to have been caused by injuries predating her scalp laceration. The pre-existing bruises and the location of the laceration, which was directly on top of her head, seemed inconsistent with a fall, which made Dr. Baumgard concerned that she had been the victim of domestic violence. During his deposition, Dr. Baumgard noted that he recalled speaking with Mr. Snowden regarding involvement of the police relative to Ms. Garza-Morgan's injuries. However, Dr. Baumgard could not remember whether he directed Mr. Snowden to call the police or whether Mr. Snowden informed Dr. Baumgard that the police had been called. In any event, he agreed with the decision to involve law enforcement.

{¶22} Sergeant Zapolski averred in his affidavit that, after hospital staff alerted law enforcement of their suspicions of domestic violence, Officer Daniel A. Bozsoki went to the hospital, where he interviewed Ms. Garza-Morgan, viewed her injuries, and spoke with the hospital staff. Sergeant Zapolski provided a case report which set forth a summary of the

interviews. In the case report, Officer Bozsoki concluded that, because Ms. Garza-Morgan had provided alternative explanations for her injuries, her explanations were unreliable. In the report, Officer Bozsoki determined that there was probable cause to arrest Mr. Morgan based upon his investigation. As a result, he executed a warrant and Sergeant Zapolski arrested Mr. Morgan on the warrant when Mr. Morgan returned to the hospital.

The Morgans' Brief in Opposition to Summary Judgment

{¶23} In their brief in opposition to Appellees' motion, the Morgans maintained that questions of fact still existed as to their claims. In support, they produced the deposition testimony of Sergeant Zapolski and an affidavit of Ann Quimby, RN.

{¶24} In his deposition, Sergeant Zapolski testified that, as a matter of practice, an investigation made in response to a hospital's report of possible domestic violence includes the interviewing of hospital staff. In conducting these interviews, the department tends to rely greatly upon the expertise of the medical personnel.

{¶25} Ms. Quimby averred that she had forty-eight years of nursing experience, and she made an independent review of Ms. Garza-Morgan's hospital records, police report, and deposition testimony. Based upon her review, Ms. Quimby concluded that Ms. Garza-Morgan's behavior did not indicate that she was fearful of Mr. Morgan. She also reviewed Community Health's procedures, and she opined that Mr. Morgan did not exhibit signs consistent with that of an "abuser" as that term is described in the procedures. Further, no documentation in Ms. Garza-Morgan's records indicated the cause of injury to be domestic abuse. Based upon her review, Ms. Quimby believed that Community Health's medical and nursing staff "did not have reasonable cause to report to law enforcement that [Ms.] Garza-Morgan had suffered domestic abuse by her husband [Mr.] Morgan on July 31, 2006."

**{¶26}** Based upon the above, the Morgans argued that questions of fact existed as to whether Appellees' actions fell within the purview of R.C. 2921.22.

**{¶27}** We will separately discuss the propriety of granting the Appellees' motion for summary judgment on Mr. Morgan's claims and on Ms. Garza-Morgan's claims. We will address these claims out of the order that they were presented in the complaint to facilitate our discussion.

Summary Judgment on Ms. Garza-Morgan's Claims

**{¶28}** As set forth above, Ms. Garza-Morgan's claims against Appellees for invasion of privacy and wrongful disclosure are predicated upon Appellees' statements to police pertaining to her confidential medical information. Appellees maintained in their motion for summary judgment that no question of fact existed on these claims because they were immune under R.C. 2921.22(H), as they acted in accordance with R.C. 2921.22(B). The Morgans responded that triable issues remained as to the applicability of R.C. 2921.22(B)/(H). On appeal, the Morgans have framed the issues in their brief and have limited their arguments as to whether triable issues remained on the questions of (1) the reasonableness of Community Health's belief that an offense of violence caused the injuries, and (2) whether Mr. Snowden was a person "giving aid" within the meaning of R.C. 2921.22(B). We will likewise limit our discussion.

**{¶29}** R.C. 2921.22(B) mandates the disclosure to law enforcement of serious physical harm where a person giving aid has a "reasonable cause to believe" that the harm resulted from an offense of violence. Whether one has "reasonable cause to believe" requires a determination of "whether a person of ordinary prudence and care would believe" that the circumstances at issue exist. *See State v. Overholt*, 9th Dist. No. 02CA0108-M, 2003-Ohio-3500, ¶ 22 (examining R.C. 2913.51(A), which prohibits receipt of property that one has "reasonable cause to believe"

has been obtained through commission of a theft offense"), citing *State v. Petty*, 8th Dist. No. 52069, 1987 WL 11401, *4 (May 21, 1987).

**{¶30}** In light of the undisputed facts, we conclude that Community Health had reasonable cause to believe that Ms. Garza-Morgan was the victim of an offense of violence. There is no dispute of fact that Ms. Garza-Morgan entered the emergency room alone, bleeding heavily from a laceration to her scalp, and this laceration was located directly atop of her head. There is also no dispute that Ms. Garza-Morgan could not explain to the hospital staff the cause of her injuries, and instead merely suggested that she might have fallen. Further, Ms. Garza-Morgan had bruises on other locations of her body which appeared to predate her fall. Moreover, there is no dispute that Ms. Garza-Morgan entered the hospital alone, and Mr. Morgan entered the lobby thereafter. Mr. Morgan also acknowledged that he left the hospital while Ms. Garza-Morgan was being treated, advising that he would come back when she was ready to leave. The particular facts and circumstances of this case, including the nature and location of Ms. Garza-Morgan's injuries, and what could reasonably be construed as unusually apathetic behavior on the part of Mr. Morgan, gave Community Health a reasonable basis to believe that Ms. Garza-Morgan had been the victim of domestic violence.

**{¶31}** Next, in regard to the Morgans' argument regarding a "person giving aid," R.C. 2921.22(B) requires "physicians, limited practitioners, nurses, or other persons giving aid to a sick or injured person" to make the required disclosure. The parties agree that Mr. Snowden was not a physician, limited practitioner, or nurse. Therefore, R.C. 2921.22(B) applied to him if he was a person "giving aid" to Ms. Garza-Morgan. The Morgans maintain that R.C. 2921.22(B) applies only to those with a medical license based upon the rule of statutory construction of *ejusdem generis*. *See McGuire v. Lorain*, 9th Dist. No. 10CA009893, 2011-Ohio-3887, ¶ 5,

quoting *Light v. Ohio University*, 28 Ohio St.3d 66, 68 (1986) (doctrine of *ejusdem generis* holds that if "general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated.").

**{¶32}** We decline to adopt such a limited interpretation of a "person giving aid" as advanced by Appellees, as, the General Assembly could have easily limited the applicability of R.C. 2921.22(B) to only licensed healthcare workers, had it intended to do so. *See* R.C. 2711.22(B)(1) (defining a "healthcare provider" as used in R.C. 2711.23 and 2711.24 as including several licensed healthcare professionals, such as a physician, licensed practical nurse, registered nurse, advanced practice registered nurse, and emergency medical technicians), and R.C. 3701.74(A)(4) (defining a "health care practitioner" as including numerous *licensed* medical professionals). We also note that the provision did not further limit the privilege to those rendering *treatment* to a sick or injured person, but rather *aid*. Aid appears to be a broader category than treatment.

**{¶33}** Instead, when construing a statute, we first must look to the plain language of its provisions. *Hewitt v. L.E. Myers*, 134 Ohio St.3d 199, 2012-Ohio-5317, ¶ 16, citing *State v. Chappell*, 127 Ohio St.3d 376, 2010-Ohio-5991. "In doing so, we read words and phrases in context and according to the rules of grammar and common usage, and they must be given a technical or particular meaning if appropriate." *Id.*, citing R.C. 1.42. Applying those principles to the language at issue, "to aid [vb.]" means "to provide with what is useful or necessary in achieving an end," and "aid [n.]" means "the act of helping[.]" Merriam-Webster's Collegiate Dictionary, 26 (11th Ed.2005). Whereas, "to treat" in this context means "to care for or deal with medically or surgically." Merriam-Webster's Collegiate Dictionary, 1333 (11th Ed.2005). Thus, we conclude that based upon its context and plain meaning, a "person giving aid" within

the meaning of R.C. 2921.22 is a person who is helping an individual achieve treatment of her injury, even though that person may not be directly involved in rendering medical treatment. We note that this interpretation is also consistent with the doctrine of *ejusdem generis*, although not as limited in scope as the Morgans have urged.

{¶34} Here, there is no dispute of fact that Mr. Snowden was an "access family liaison" and his job duties entailed making initial contact with patients, and reporting their information to medical staff, who then determined priority of the treatment based upon this information. We conclude that, in this capacity, Mr. Snowden is a person who helps individuals obtain treatment for their injuries. Accordingly, we conclude that R.C. 2921.22(B) is applicable to Mr. Snowden.

{¶35} Therefore, the trial court did not err in granting summary judgment to Appellees on Ms. Garza-Morgan's claims, as Appellees were immune from suit under R.C. 2921.22(H) on these claims because they acted in accordance with R.C. 2921.22(B).

Summary Judgment on Mr. Morgan's Claims

{¶36} Although immunity under R.C. 2921.22(H) is applicable to Ms. Garza-Morgan's claims, we cannot conclude that it is applicable to Mr. Morgan's claims. As set forth above, R.C. 2921.22(H) provides that disclosure of information pursuant to R.C. 2921.22 cannot give "rise to any liability or recrimination *for a breach of privilege or confidence*." (Emphasis added.). Mr. Morgan's claims are not based upon breach of privilege or confidence. Unlike Ms. Garza-Morgan's claims, the parties at no time assert that the Appellees owed a duty to Mr. Morgan to maintain his statements in confidence, and Mr. Morgan does not base his claims upon a breach of such a duty. Instead, his defamation claims arise due to the purported statement made by Mr. Snowden to the police that Mr. Morgan committed an act of domestic violence

against Ms. Garza-Morgan.  Therefore, R.C. 2921.22(H) does not preclude his liability on these claims.

{¶37} Be that as it may, the inapplicability of subsection (H) to these claims does not negate Mr. Snowden's duty to disclose information to law enforcement as required under subsection (B), discussed above.  R.C. 2921.22.  Based upon this duty, the Appellees also argued in their motion for summary judgment that Mr. Snowden's statement to police officers was qualifiedly privileged and that the Morgans could not demonstrate actual malice in order to overcome the qualified privilege.  *See Jacobs v. Frank*, 60 Ohio St.3d 111 (1991), paragraph two of the syllabus (where a statement is qualifiedly privileged, the privilege "can be defeated only by a clear and convincing showing that the communication was made with actual malice.").  However, because we conclude that absolute privilege existed to protect Mr. Snowden's statements pertaining to Mr. Morgan for reasons independent of R.C. 2921.22, we need not reach the issue of whether a question of fact existed as to qualified privilege and actual malice.

{¶38} "Under the doctrine of absolute privilege, statements made in a judicial proceeding which bear some reasonable relationship to the proceeding are not actionable." *Kutnick v. Fischer*, 8th Dist. No. 81851, 2004-Ohio-5378, ¶ 27, citing *M.J. DiCorpo,* 69 Ohio St.3d at 505.  The privilege applies even if the statement is untrue.  *Pease Co. v. Huntington Nat. Bank*, 24 Ohio App.3d 227, 232 (10th Dist.1985), citing *Buehrer v. Provident Mutual Life Ins. Co.*, 123 Ohio St. 264 (1931), paragraph four of the syllabus.  Whether this privilege applies in a given case is a question of law.  *Surace v. Wuliger*, 25 Ohio St.3d 229, 231 (1986).

{¶39} While the instant matter was pending on appeal, this Court decided *Lasater v. Vidahl*, 9th Dist. No. 26242, 2012-Ohio-4918.  In *Lasater*, we adopted the approach of the Fourth District, holding that "absolute privilege should apply to those who report criminal

activity to police officers." *Id.* at ¶ 9; *Brown v. Chesser*, 4th Dist. No. 97 CA 510, 1998 WL 28264, *4 (Jan. 28, 1998). This absolute privilege applies if the statements "bear some reasonable relation to the activity reported." *Lasater* at ¶ 11, citing *M.J. DiCorpo*, 69 Ohio St.3d at syllabus. Here, in the complaint, Mr. Morgan maintained that Mr. Snowden "verbally reported and published to third parties, namely officers of the City of Lorain Police Department, that [Mr.] Morgan was responsible for the injuries for which Ms. Garza-Morgan had been treated at[ ]Community Health[.]" Given our holding in *Lasater*, Mr. Snowden's statement to police is absolutely privileged as it was made to police officers and was reasonably related to the crime reported.

{¶40} Accordingly, as Mr. Morgan based his defamation claims solely upon Mr. Snowden's report to police officers, summary judgment was appropriate.

### III.

{¶41} The Morgans' sole assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

―――――

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
CARLA MOORE
FOR THE COURT

HENSAL, J.
CONCURS.

BELFANCE, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

RICHARD R. MELLOTT, JR., Attorney at Law, for Appellants.

RYAN K. RUBIN, ALLISON E. HAYES, and THOMAS P. MANNION, Attorneys at Law, for Appellees.